# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00889-CV

**V. C. and R. S., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. D-1-FM-16-006773, HONORABLE TIM SULAK, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Appellants V.C. and R.S. appeal the district court's judgment rendered on the jury's verdict terminating their parental rights to their child L.S.[1] The jury found that Appellants "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" and "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). The jury also found that termination of Appellants' parental rights was in the child's best interest. *See id.* § 161.001(b)(2).

On appeal, Mother V.C. challenges the factual and legal sufficiency of the evidence supporting the jury's findings on endangerment and best interest and the district court's denial of her

---

[1] We refer to Appellants and the children by their initials or by their relationship to L.S. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8(b)(2).

requested jury instruction. Father R.S.'s court-appointed appellate counsel has filed an *Anders* brief concluding that Father's appeal is wholly frivolous. *See Anders v. California*, 386 U.S. 738, 744 (1967); *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 646–47 (Tex. App.—Austin 2005, pet. denied) (applying *Anders* procedure in appeal from termination of parental rights). Having conducted an exacting review of the evidence in its entirety, we will affirm the district court's judgment of termination. *See In re A.B.*, 437 S.W.3d 498, 505 (Tex. 2014).

## BACKGROUND[2]

Eighteen witnesses testified during the two-week jury trial in the underlying case including Mother, her father, her friends and her expert-witness physicians, a paramedic and hospital physicians who saw L.C.S., the medical examiner who performed L.C.S.'s autopsy, Texas Department of Family and Protective Services staff, a Court Appointed Special Advocate (CASA) supervisor, the foster parents to Mother and Father's children, a psychologist, and Father.[3] The jury heard that Mother and Father are the unmarried biological parents of twin sons L.S. and L.C.S., who were born prematurely on March 31, 2015. Mother and Father are also the parents of a daughter K.S., who was born in 2016. Additionally, Mother has two children—a son D.H.C., born in 2008, and a daughter H.V.C., born in 2011—from her previous relationship with another man.[4]

---

[2] The facts are summarized from the testimony and exhibits admitted into evidence at trial.

[3] Father testified briefly at trial, stating his name, age, and length of time living in Austin, but afterward invoked his Fifth Amendment right against self-incrimination.

[4] Mother's children K.S., D.H.C., and H.V.C. were the subjects of separate cases with the Department and are not involved in this appeal.

Mother and Father began dating in 2013. She testified that after the twins were born, she, her four children, and Father lived with her parents. Mother's two brothers, her niece, and her brother's girlfriend also lived in Mother's parents' house. Mother was her children's primary caregiver. Mother and Father moved out of her parents' house in early 2017. By the time of trial, L.S. was 2½ years old, and he and his sister K.S. were living with foster parents; D.H.C. and H.V.C. were living with their biological father; L.C.S. was deceased; and Father was incarcerated on charges related to L.C.S.'s death.

**L.C.S.'s 2015 injury, hospitalization, and placement in foster care**

The events leading to the Department's first removal of Mother's children from her care occurred on September 30, 2015. On that day, Mother was in her room in her parents' home with the twins, and Father was in the children's room. Mother took L.C.S. to Father and told him to watch L.C.S. while she cleaned the other room. Mother placed L.C.S. face down on the bed and gave him his dinosaur toy, a stuffed animal. Five to ten minutes later, she heard Father screaming that something was wrong with L.C.S. Mother ran to the room where she saw Father carrying L.C.S., who was "turning different colors and shaking." Mother then ran back to the other room to get her phone and called 911.

Father's recollection of that day's events is documented in hospital records that were admitted into evidence and contain his statements to L.C.S.'s health care providers. In those records, Father stated that Mother was cleaning a room while he was on his mobile phone and that he left that room to go into an adjacent bedroom to continue working on his phone. Father stated that after about five minutes alone in the room, Mother brought L.C.S. into the room and placed L.C.S. on the

3

bed. Father said that he was sitting on the floor next to the bed and that he looked up and saw L.C.S. on his back, and then turned over on his stomach, playing with a stuffed toy. Shortly afterward, Father heard L.C.S. make a "weird sound" and saw that L.C.S.'s "entire face turned purple and blue." Father recalled that he stood up, scooped L.C.S. into his arms, and started "tapping" L.C.S. on his back. Father had L.C.S. positioned across one of his forearms and facing down while Father "tapped" L.C.S. with his other hand. Father stated that he then turned L.C.S. face up and saw L.C.S.'s whole body trembling, and L.C.S. scratching at his own head and face. Father stated that he took L.C.S.'s hands away from his face, and that L.C.S. then began to go limp·and close his eyes. Father then called for his wife and walked to the hallway between the two bedrooms, where he met Mother and instructed her to call 911.

The jury heard a recording of Mother's 911 call. In the first two minutes of the recording, Mother states that her six-month-old baby is not responding, that he is having trouble breathing, and that "he's like bleeding, I don't know from where." The 911 operator asked Mother, "Did he choke on something?" and Mother responded, "No." Four minutes into the call, the staffer proceeds to give Mother directions for checking inside the baby's mouth for food or vomit. Mother checks and states that there is none, but that there is blood inside his mouth. During trial, Mother initially testified that she did not remember saying that L.C.S. had blood in his mouth. She later testified that she did see blood, but only after the 911 operator asked her to clear L.C.S.'s throat. She further testified that she opened L.C.S.'s mouth and put her finger inside it "because he was choking."

4

Records from the paramedics who assisted L.C.S. noted several injuries in different stages of healing—fresh bruising to L.C.S.'s left cheek with swelling, bruising to both his ears and behind his left ear, an older abrasion to the outer ear canal of his right ear, an older contusion with abrasion on his left forehead, a new abrasion to his right eyelid, a new abrasion to bridge of his nose, and bleeding to his upper lip—leading the paramedics to believe that L.C.S. suffered a physical assault. The paramedics transported L.C.S. to Dell Children's Medical Center, contacted Child Protective Services and the sheriff's office, and provided a detective with a witness statement.

According to medical records from Dell, Father told health care providers that L.C.S. injured himself by hitting his head "repeatedly" on a dinosaur toy. Father described L.C.S. as being "strong willed" and stated that L.C.S.'s most frustrating behavior is that he "has to be held to fall asleep." Mother told health care providers that Father had been job hunting on his phone when she asked him to watch L.C.S. Mother also told health care providers that she noticed bleeding in L.C.S.'s right ear "about 3 days ago." She denied having any problems or complications with L.C.S.'s birth or pregnancy. The medical records reflect that L.C.S. had no history of seizures and no history of trauma "except dropped toy on face." L.C.S.'s health care providers noted that his head showed evidence of trauma and that he had multiple facial abrasions and bruises. Ultimately, doctors diagnosed L.C.S. with seizures, a subdural hematoma—described by medical-expert testimony as bleeding between the skull and brain, and retinal hemorrhaging—described by medical-expert testimony as bleeding of the blood vessels in the retina at the back of the eye. Dr. Marion Forbes, who saw L.C.S. at Dell, testified that when a baby has a forceful acceleration-deceleration-type force applied to the head, blood vessels on the outside surface of the brain tear

easily and bleed. She stated that children who sustain these acceleration-deceleration forces causing subdural hematomas and retinal hemorrhages "become symptomatic and develop ill signs immediately." Doctors who treated L.C.S. concluded that what happened to him was "[m]ost likely non-accidental trauma," and medical records reflect that L.C.S.'s "[p]arents have been told that injuries are due to trauma." Mother testified specifically that "a doctor came to me and told me that [L.C.S.] was suffering from shaken baby syndrome." Both Mother and Father denied any shaking episodes or any other seizure-like activity before this event.

After L.C.S. was discharged from the hospital in October 2015, the district court granted the Department temporary managing conservatorship of L.C.S. and L.S.; finding that their physical health or safety was in immediate danger. L.C.S. and L.S. were removed from Mother and Father and placed with foster parents, Jonathan Paul Turner and Gayla Turner. Mother's two older children D.H.C. and H.V.C. were placed with their biological father.

Less than a week after L.C.S. was discharged from Dell, L.C.S. was readmitted for examination after the Turners noticed that any movement or change in altitude of L.C.S.'s head caused him to cry. Doctors found more fluid between L.C.S.'s brain and skull, and a shunt was placed in his skull for one year to drain the fluid and relieve pressure around his brain. During this time, L.C.S. was prescribed and then weaned from anti-seizure medication. L.C.S. did not have any seizures, even after his medication was discontinued, and he had no other hospitalizations during the seventeen months that he was in the Turners' care.

6

**Temporary orders and home study after L.C.S. and L.S.'s removal**

On October 30, 2015, the district court signed temporary orders allowing Mother and Father to have supervised visitation with L.C.S. and L.S. and requiring Mother and Father to complete services. The court also ordered that all parties be provided with "the home study for maternal grandmother."

A home study on the maternal grandparents was admitted into evidence. Although Mother and Father agreed to move out of the house if the grandparents were approved as a placement option, the grandparents were not approved. The home study identified several concerns, including: (1) the grandparents' denial that Mother or Father could have injured L.C.S., despite knowing that doctors found L.C.S. suffered trauma "as if he had been shaken"; (2) the grandparents' lack of valid driver's licenses; and (3) the criminal history of their son M.C., a frequent visitor to their home, who had arrests for alcohol intoxication and drug possession. In the home study, the grandparents' other son G.C., who lived with them, denied that he was ever a perpetrator of abuse.

However, at a mediation conducted in 2016, the Department learned that in 2011, when G.C. was eleven-and-a-half years old, he sexually abused Mother's two-year-old son in the grandparents' home. At trial, Mother testified that she witnessed G.C. performing oral sex on D.H.C. The grandparents and Mother were aware of the sexual abuse perpetrated by G.C. but failed to disclose it. Mother stated that she did not call the police, and that she did not tell Father about the abuse because she feared that he might think differently about her brother. Mother also stated that she avoided her brother for about a year and a half, but she admitted that she and her children moved back into her parents' home while her brother was still living there. Further, according to notes from

7

the staff supervising Mother's visitation, Mother requested that the Department add her brother to her visits with L.C.S. and L.S. because she wanted him to see his nephews. At trial, Mother denied making that request. But in a later report to the court, issued after Mother had some unsupervised visits, the Department specified that it "informed [Mother] that her brother is not allowed to be near her children during unsupervised visits." The report states that Mother's children are not in the grandparents' house where Mother and Father reside, noting that "[t]here is too much risk bringing the children back in a home with a juvenile sex offender."

**L.C.S.'s 2017 injury and death**

By March 28, 2017, Mother and Father had their own home and the court signed an order for the monitored return of L.C.S. and L.S. from the Turners to Mother and Father. The order, which was admitted into evidence, extended the dismissal date for the case and kept the Department as managing conservator of L.C.S. and L.S. The CASA supervisor assigned to L.C.S. and L.S.'s case, Rushmi Karim-Paris, testified that the case was near the end of an eighteen-month deadline, requiring either a dismissal, a trial to terminate parental rights, or the return and monitoring of the children. Karim-Paris stated that although CASA was still concerned about the lack of explanation for L.C.S.'s 2015 injuries and expressed that concern to all the parties, Mother and Father had "done a series of services," and the return-and-monitoring phase would extend the case and allow for continued supervision. She explained, "[W]e and the other child advocates and the court would stay involved for hopefully up to another six more months, and that would give us a chance to keep . . . our eyes on the children and on the parents." Department caseworker Jordan Ayres visited L.C.S. and L.S. in Mother and Father's home weekly during the monitored-return period.

8

Mother noticed that L.C.S. cried more than L.S. Mother also noticed bruises on L.C.S.'s stomach "a lot" and saw blood in his stool, but she did not tell Ayres what she had seen. Ayres testified that if Mother had mentioned L.C.S.'s bruises and the blood, Ayres would have been concerned and would have encouraged Mother to seek immediate attention for L.C.S. Ayres stated that after the events of September 2015, she would have expected Mother to express some understanding or willingness to inquire more about a medical issue with L.C.S. Ayres acknowledged that a caseworker cannot be in a home every minute of every day and that she thought Mother "ignored signs that something might be going on." Most of the time when Ayres visited Mother's and Father's home during the monitored-return period, Mother was the only parent there. Ayres testified that during that time, she saw Father in the house only once, and "he was on his computer with his headphones on and didn't interact with me or the boys."

On May 24, 2017, less than two months after L.C.S. returned to Mother and Father's home, L.C.S. again sustained serious injuries while in Father's care. Mother told a Department caseworker that Father did not go to work that morning because he had missed his ride. Mother testified that she left Father with the children at home while she went to the grocery store. As she was leaving the house, L.C.S. followed her to the garage crying because he wanted her to take him along or because he did not want her to go. Mother stated that when she left, Father was bottle-feeding their infant daughter K.S. Father was the only person in the home with the children.

Mother stated that she was in the grocery store checkout line when Father called, asking her to call 911. Recordings of Mother's two calls to 911 were admitted into evidence. In the first one, Mother states that she is leaving the grocery store and requests that an ambulance be sent

9

to her house because her husband called and said that her son is having trouble breathing. The 911 operator asks for Father's phone number, which Mother provides, noting that Father only speaks Spanish.[5] The operator states that she is going to call him and that she will have a Spanish interpreter on the phone.[6] The second call occurred as Mother was arriving at her house and entering it. Mother testified that when she arrived, she saw that L.C.S. was not wearing any clothes, was not breathing, and his eyes were open without moving. On the 911 recording, Mother is heard screaming and a male voice responds briefly to her. Mother tells the 911 operator that she does not see her son breathing and that he has "a lot of saliva from his nose and his mouth." Seconds later, Mother states that the paramedics have arrived.

According to a report from paramedic Matthew Daves, L.C.S. was on the couch, unconscious, unresponsive, pulseless, and showing "cyanosis" of his head and extremities. Daves testified that cyanosis is a visual sign that "there's an issue with oxygenation, either . . . a respiratory issue or the heart is not pumping. Your extremities, and especially in children, around the mouth and lips will turn blue and that's from the lack of oxygen." Daves acknowledged that with a lack of circulation there is a delay in the development of bruising. He testified that L.C.S. had been without circulation for almost thirty minutes before his circulation returned. Daves's report noted that L.C.S.'s neck had "horizontal marks and circular patterns (almost dirt color in nature)

---

[5] Mother testified that she may have given conflicting statements in this case due to difficulty in translation because Spanish is her first language. She had Father's interpreter assist her as needed at trial. However, medical records show that her preferred language is English, the jury heard her conversations with 911 in English, she spoke with a bilingual Department caseworker only in English, and her counsel informed the court she would have limited need for the interpreter because, "Your Honor, my client speaks English very well."

[6] No recording of the call to Father from 911 was admitted into evidence.

10

around and above the larynx." Paramedics suctioned L.C.S.'s airway multiple times to remove "peanut-buttery-type vomit," performed cardiopulmonary resuscitation, and after L.C.S.'s pulse returned, transported him to the pediatric emergency room at St. David's North Austin Medical Center.

A few hours later, after diagnosing L.C.S. with cardiorespiratory arrest and a subdural hematoma that was "most likely nonaccidental," the St. David's staff had L.C.S. airlifted to Dell Children's Medical Center for evaluation in the pediatric intensive care unit. L.C.S. was diagnosed with multiple injuries, including: anoxic brain injury—described by medical-expert testimony as an absence of oxygen to the brain—revealed by diagnostic tests showing brain swelling and damage to brain cells; subdural hematomas; retinal hemorrhages; bruising and abrasions to the right side of his chest; bruises on his lower back; lung contusions; liver lacerations; a duodenum/small intestine hematoma; an adrenal gland hematoma; and new and healing rib fractures. Further diagnostic tests showed that L.C.S. had no brain activity, and he was pronounced dead on May 25, 2017.

Travis County Deputy Medical Examiner Dr. Leisha Wood performed an autopsy on L.C.S. In addition to the injuries that doctors had previously noted, Dr. Wood found others including a fracture of the skull due to brain swelling, neck muscle and ligament hemorrhages, and two large bruises under L.C.S.'s scalp along with several smaller bruises to his head that were not visible until after his hair was shaved. Dr. Wood issued a report concluding that the cause of L.C.S.'s death was blunt force injuries and that the manner of his death was a homicide.

Father shared his recollection of that day's events with Dr. Forbes, who saw L.C.S. at Dell. He stated that while Mother was gone, L.C.S. came running to him holding his belly,

vomited, and then collapsed. Father said that he then called Mother stating that L.C.S. seemed to be choking and not breathing properly and that she should come home. Dr. Forbes testified that Father's account of events did not explain L.C.S.'s injuries because "running and falling could not begin to create the injuries that he sustained. In no way is that possible." Father also told Dr. Forbes that he thought L.C.S. had been playing with a can of Hot Shot bug spray beforehand. But Dr. Wood testified that she conducted toxicology tests as part of her autopsy and that there was no indication that L.C.S. died from bug spray poisoning. She further testified that "his esophagus was not necrotic, so no indication that he ingested any kind of acidic or caustic substance." Father also spoke about the incident with CPS investigator Gina Torres, who testified that he "did disclose to a certain degree what happened. And then toward the latter part of the conversation, he had requested a lawyer and then said it was because of what happened in the last case." Father told her he was apprehensive about contacting 911 himself and did not do so "because of what happened in the last case."

Doctors asked Mother what happened to L.C.S., and she responded that she did not know because she was not home. She suggested that several of L.C.S.'s injuries were due to his fall from a plastic slide at a playground the week before, when he may have hit his head. Mother told caseworker Torres that L.C.S. hit his head on a slide causing a bruise on the side of his face. Mother told caseworker Ayres that L.C.S. "fell sideways" from a slide causing bruising to his stomach. Ayres testified that Mother later told the Department that L.C.S. died from an organic brain disease, a fever, or choking on a peanut butter sandwich. Mother also suggested that the Turners could have abused L.C.S. She testified, "The only thing that I know[,] what the doctor testified[,] is that [L.C.S.] had some broken ribs that were between six and eight weeks old. And that could have

12

happened when he was with . . . the foster parents or when the paramedics or Dell Children's performed CPR." After the Department's counsel pointed out that healing rib fractures between six and eight weeks old could not have been caused by EMS or Dell, Mother acknowledged that the Turners would not have been responsible for "[t]he recent ones, the fresh ones, no. But the old ones that were six to eight weeks, they were." Next, the Department's counsel noted that if the fractures were at the most eight weeks old, there were only two days during that eight-week period when L.C.S. was with the Turners. Mother said, "I don't know if it was only two days that he was with [them]."

**Mother's protectiveness of Father**

Mother testified that she never asked Father what happened to L.C.S. She acknowledged that it seemed strange that none of L.C.S.'s problems started until after she left him alone with Father. She also stated, according to caseworker Torres, that there were times when Father would get frustrated with the children and that he would come home from work upset and "screaming." Mother's two older children D.H.C. and H.V.C. were interviewed at the Center for Child Protection and described Father as "mean and scary." But Mother testified that those statements were the result of D.H.C. and H.V.C. being "manipulated."

Mother admitted that at a prior hearing, she said she did not want Father near her children. When asked why she would say that if she did not think that he hurt her child, Mother testified, "At the time that happened—well, I didn't—I didn't know anything." Mother also told her therapist Yolanda Moreno that if L.C.S.'s autopsy showed "that it is shaken baby syndrome," Mother would end her relationship with Father. However, the jury heard Mother testify about how she

13

trusted Father with her children, even after L.C.S.'s injuries in 2015, his death in 2017, and the findings in the autopsy report. Mother testified that Father is a good caregiver for the children, that he can safely care for them, and if his parental rights were terminated, she thought he might still be able to have supervised visitation. Mother maintained frequent contact with Father during his incarceration on charges related to L.C.S.'s death. Jail records show that Mother had over 500 phone calls with Father in less than five months, and she testified that she sent money to him and visited him. Mother also had D.H.C. and H.V.C., who are not Father's children, speak with Father by phone. Caseworker Ayres testified that she listened to the call and that it did not appear as though the children willingly participated in the conversation.

**Mother's expert-witness physicians**

### 1. Dr. Joseph Scheller

Mother's two expert-witness physicians testified that L.C.S.'s injuries were not trauma related. Pediatric neurologist Dr. Joseph Scheller testified that "[t]he number one cause of subdural hematoma in the whole world is getting hit on the head by something" and that "[h]ead trauma doesn't come from natural disease." He agreed that—as Dr. Wood concluded—a severe impact could cause a person's brain swelling, could stop his breathing, and then result in his death. But he said, "The only thing that is preventing me from saying that is I don't see the trauma." Specifically, Dr. Scheller testified that L.C.S. had no scalp or skull injury, which "very strongly argues against" a serious impact to his head. Nevertheless, Dr. Scheller testified that it was possible—as Dr. Wood stated in her autopsy report—that L.C.S. had external bruising to his head

14

that was not visible when he had a full head of hair, and that such bruising could have been missed by emergency medical staff and hospital staff.

Dr. Scheller also testified that he did not believe that a rapid acceleration-deceleration injury could cause the types of injuries that L.C.S. sustained. Dr. Scheller acknowledged that his rejection of rapid acceleration-deceleration as causation for such injuries is a view that is shared by only five percent of the relevant medical professionals and that puts him at odds with the views of organizations such as the American Academy of Pediatrics, the World Health Organization, the American Academy of Opthalmology, the American Association for Pediatric Ophthalmology, the American College of Radiology, the American Academy of Family Physicians, the American College of Surgeons, the American Association of Neurological Surgeons, the Pediatric Orthopedic Society of North America, the American College of Emergency Physicians, and the American Academy of Neurology.

When Dr. Scheller was asked about testimony he gave in another case—in which he stated that he would expect to see a child have physical injuries such as skull fractures, brain bruising, and neck injuries in order to be able to find shaken baby syndrome—Dr. Scheller said that "sounds like something I would say." Dr. Scheller had no theory on what may have caused L.C.S.'s neck ligament injuries and subscalp contusions as described in Dr. Wood's autopsy report. His opinion was that L.C.S. had a brain irritant of blood drops, a piece of his shunt, or brain scarring, which presented a persistent risk of seizures and caused the 2015 and 2017 incidents. He further opined that L.C.S.'s retinal hemorrhages were due to "a circulation problem of [L.C.S.]'s brain that indirectly affected the eye circulation." Dr. Scheller testified that he knew that L.C.S. had several

15

healing rib fractures, but that fact did not figure into his opinion in this case, and Dr. Scheller stated that he would not find it strange if a parent was unable to explain how a child had sustained multiple broken ribs. But ultimately, Dr. Scheller agreed that if he were the primary care provider for a child who presented with a subdural hematoma, bilateral ear bruising, bilateral retinal hemorrhages, and a facial bruise—as L.C.S. had in 2015—he would contact Child Protective Services. Dr. Scheller similarly testified that if a child came into his practice with subdural hematomas, anoxic brain injury, healing rib fractures, bruises, and an adrenal gland laceration—as L.C.S. had in 2017—he would contact Child Protective Services.

### 2. Dr. Charles Minor Harvey

Mother's other expert-witness physician was forensic pathologist Dr. Charles Minor Harvey. Dr. Harvey acknowledged that he could not state accurately when he had last performed an autopsy on a child, but he testified that he had not performed any autopsies in over twelve years.

Dr. Harvey attributed L.C.S.'s injuries to various medical conditions. One was Waterhouse-Friderichsen Syndrome, which Dr. Harvey stated is almost always associated with bacterial meningitis—a condition that Dr. Scheller had already testified that L.C.S. did not have. Dr. Harvey stated that the Syndrome occurs through disseminated intravascular coagulation (DIC), which makes the blood unable to clot. Another condition Dr. Harvey stated that L.C.S. had was Ormond's Disease, or retroperitoneal fibrosis, a rare diagnosis reported in only twenty-four children worldwide, and which Dr. Harvey saw only once in an elderly female patient. Dr. Harvey was unable to state the cause of that condition in this case. Dr. Harvey also testified that L.C.S. had reperfusion syndrome, which Dr. Harvey described as the reestablishment of a heartbeat and blood

16

pressure in blood vessels following a period of no heartbeat and no blood pressure. Dr. Harvey also referred generally to another condition, Grey Turner's Sign, as causing a gray discoloration of the skin that could be confused with bruising and could show up anywhere on the body. Dr. Harvey noted that this condition is associated with acute pancreatitis. But no one ever diagnosed L.C.S. with acute pancreatitis. Ultimately, Dr. Harvey opined that L.C.S. choked on aspiration of food and had three synergystic conditions of: (1) oxygen deprivation leading to brain death; (2) DIC that made his blood unable to clot; and (3) reperfusion syndrome. These conditions weakened L.C.S.'s blood vessels, causing brain swelling and bleeding from many different sites. Dr. Harvey did not address the cause of L.C.S.'s healing rib fractures.

At the conclusion of the trial, the jury returned its verdict terminating Mother's and Father's parental rights to L.S., and the district court rendered judgment on that verdict. Mother filed a motion for judgment notwithstanding the verdict that was denied after a hearing, and a motion for new trial that was denied by operation of law. This appeal followed.

## DISCUSSION

### I. Mother's appeal

In her first two issues, Mother challenges the factual and legal sufficiency of the evidence supporting the jury's findings on endangerment and best interest. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (2). In a proceeding to terminate the parent-child relationship, the petitioner must establish by clear and convincing evidence a predicate violation—i.e., that the parent's acts or omissions constitute a ground for termination under section 161.001(b)(1)—and that termination of parental rights is in the child's best interest. *Id*. § 161.001(b)(1), (2); *In re S.M.R.*, 434 S.W.3d 576,

17

580 (Tex. 2014). Only one statutory ground is necessary to support a judgment in a parental-rights-termination case. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *Spurck v. Texas Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 221 (Tex. App.—Austin 2013, no pet.). Accordingly, when multiple statutory grounds for termination are alleged and the trial court issues a broad-form question asking the jury whether the parent-child relationship should be terminated, we must uphold the jury's finding if any of the statutory grounds alleged supports it. *Spurck*, 396 S.W.3d at 221.

"The purpose of terminating parental rights . . . is not to punish parents or deter their 'bad' conduct, but rather to protect the interests of the child." *In re A.B.*, 437 S.W.3d at 504. We evaluate the legal sufficiency of the evidence in parental-rights termination cases by reviewing all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the challenged finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found incredible. *Id*.

We evaluate the factual sufficiency of the evidence by reviewing the entire record, and we uphold the finding unless the disputed evidence that could not reasonably have been credited in favor of the finding is so significant that a reasonable factfinder could not have formed a firm belief or conviction that the allegation was true. *In re A.B.*, 437 S.W.3d at 502–03. We do not weigh witness credibility issues that depend on appearance and demeanor, and when credibility issues are reflected in the record, we must defer to the factfinder's determinations if they are not

18

unreasonable. *In re J.P.B.*, 180 S.W.3d at 573; *see In re A.B.*, 437 S.W.3d at 503 (directing appellate courts to give "due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses").

**Sufficient evidence supports jury's finding that Mother endangered L.S.**

In her first issue, Mother challenges the factual and legal sufficiency of the jury's finding that she endangered L.S. "Endanger," as used in this statute, means "to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). While "endanger" means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal environment, the endangering conduct need not be directed at the child—here, L.S.—and the child need not actually suffer injury. *See In re E.N.C.*, 384 S.W.3d 796, 805 (Tex. 2012) (citing *Texas Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)).

Subsections D and E of the termination statute address endangerment. Tex. Fam. Code § 161.001(b)(1)(D), (E). Under subsection D, a jury may terminate the parent-child relationship if the jury finds by clear and convincing evidence that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." *See id*. § 161.001(b)(1)(D). Subsection D addresses the child's living environment, rather than the parent's conduct, although a parent's conduct is relevant to the child's environment. *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The parent need not have certain knowledge that an actual injury is occurring, but the parent must at least be aware of the potential for danger to the child in such an environment and must

19

have disregarded that risk. *Id*. Under subsection E, a jury may terminate the parent-child relationship if the jury finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *See* Tex. Fam. Code § 161.001(b)(1)(E). Subsection E requires that the cause of the endangerment be the direct result of the parent's conduct—including acts, omissions, and failures to act—and the requirements of this subsection may be satisfied by showing that the parent engaged in a course of conduct that endangered the child's physical or emotional well-being. *In re J.D.*, 436 S.W.3d at 114. Because the evidence of endangerment under subsections D and E is interrelated, we may conduct a consolidated review. *Id*.

Here, when making a predicate finding of endangerment, the jury could have credited the evidence showing Mother's repeated lack of protectiveness toward L.S. and his siblings, both before and after they were removed from Mother's care. *See In re D.J.W.*, 394 S.W.3d 210, 220 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (concluding that parental conduct occurring before and after child has been removed by Department may be considered in determining whether termination is justified); *Cervantes-Peterson v. Texas Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (stating that manner in which parent treats other children in family may be considered in deciding whether parent engaged in course of conduct that endangered child's physical or emotional well-being). Placement with an abusive relative or parent is endangerment under either provision of the statute. *In re B.R.*, Nos. 01-13-00023 & 01-13-00024-CV, 2013 Tex. App. LEXIS 7694, at *14, *19 (Tex. App.—Houston [1st Dist.] June 25, 2013, no pet.) (mem. op.) (concluding that abuse one sibling

suffered while in his mother's care was sufficient to support termination of her parental rights to another sibling); *see* Tex. Fam. Code § 161.001(b)(1)(D), (E).

Between 2011 and 2017, two of Mother's sons were abused by two different people. The jury heard that Mother was an eyewitness to her brother G.C. performing oral sex on her two-year old son D.H.C. Mother chose to protect her brother instead of her son by refusing to report the abuse to police or CPS. Mother later moved all of her children—including her newborns L.C.S. and L.S. and her son who had previously been abused—into her parents' home where her brother still lived. Mother stated that she did not tell Father about the abuse because she did not want him to think differently about her brother. When the children were subsequently removed from Mother's and Father's care in 2015 and a home study was conducted to evaluate the safety of the children's placement, Mother (and her parents and G.C.) again failed to report the sexual abuse that occurred in that home, where the perpetrator continued to reside. Moreover, Mother stated her intention to move out if the home study was approved, which would have left her children in the house without her but with her brother. Also in 2015, Mother stated that she wanted her brother to see his nephews, and she asked the Department to add her brother to her visits with L.C.S. and L.S. Caseworker Ayres testified that the Department remained concerned that in the future, Mother might not be able to prevent harm to her children if her brother came into contact with the children.

The jury also heard that Mother chose to protect Father instead of her son by never asking him what happened to L.C.S. Caseworker Ayres testified that it was as though Mother "has kind of blinders on." L.C.S. had not learned to speak words, and he was seriously harmed in 2015 when he was left in Father's sole care. Mother testified that a doctor told her L.C.S. "was suffering

21

from shaken baby syndrome." She was also told that L.C.S.'s injuries were due to trauma, and doctors opined that what happened to him was non-accidental. *See In re A.B.*, 437 S.W.3d at 506 (noting that evidence supporting termination included medical testimony that child's injuries were not type that child would sustain accidentally). Mother specifically recalled seeing bleeding in L.C.S.'s right ear about three days before his hospitalization. Further, she admitted that it seemed strange that none of L.C.S.'s problems started until after she left him alone with Father. Once away from Father and with the Turners, L.C.S. had no seizures and no injuries requiring hospitalization. *See J.F. v. Texas Dep't of Family & Protective Servs.*, No. 03-16-00593-CV, 2016 Tex. App. LEXIS 13564, at *26 (Tex. App.—Austin Dec. 22, 2016, no pet.) (noting that strong circumstantial evidence supported finding that father was perpetrator of his children's injuries); *In re B.R.*, 2013 Tex. App. LEXIS 7694, at *16. Mother told a caseworker that she had seen Father become upset and frustrated with the children and come home screaming. Mother was also aware that her older children D.H.C. and H.V.C. had described Father as "mean and scary." But Mother refused to consider that Father could have any fault for what happened when he was left to care for L.C.S.

Additionally, Mother knew that the monitored return of her children after the 2015 hospitalization did not mean that concerns about L.C.S.'s abuse had been ruled out. Mother knew that the case had not been dismissed and that a caseworker would be visiting weekly. The trial court's monitored-return order contained no best-interest finding in favor of Mother or Father, but only the court's rulings that the Department retained its temporary managing conservatorship of the children, that the Department would monitor the safety of the children's placement, and that the case would be extended for six months. Meanwhile, Mother noticed bruises on L.C.S.'s stomach "a lot,"

22

and she saw blood in his stool. She also noticed that L.C.S. cried more than L.S. But she never mentioned these observations to the caseworker assigned to L.C.S. and L.S. during the monitored-return period. The Department expected Mother to be protective of her children after the severity of the injuries that L.C.S. suffered in 2015 and because a caseworker cannot be present in a home with the frequency of a parent. The caseworker for L.C.S. and L.S. stated that she was unsure whether Mother had the ability to recognize if one of her other children was being injured or if Mother could prevent further injuries to her children.

Evidence from L.C.S.'s final hospitalization in 2017 showed that among his many injuries, he had healing rib fractures indicating that he was injured more than once in the preceding weeks. A child's unexplained, non-accidental fractures of various ages support a reasonable inference that the child's caregivers knew of the injuries and their cause, and supports termination under subsection D. *In re L.M.M.*, 522 S.W.3d 34, 45 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); *In re J.D.*, 436 S.W.3d at 114. After hearing the evidence at trial, Mother still thought that Father might have some visitation with her children, even if his parental rights were terminated. Mother has maintained her relationship with Father during his incarceration through hundreds of phone calls, visiting him, and sending money to him. Mother has also encouraged D.H.C. and H.V.C. to have phone contact with him, even though he is not their father and he has been indicted for their half-brother's murder. Based on what she had seen, caseworker Ayres testified that she did not trust Mother to put L.S.'s interests first. *See Spurck*, 396 S.W.3d at 223 (noting that jury could have reasonably inferred that mother's failure to protect child from emotional and physical danger in past might indicate that she would fail to do so in future).

23

Viewing the evidence in the light most favorable to the jury's findings, and assuming that the jury resolved any disputed facts in favor of its findings, we conclude that the jury could have reasonably formed a firm belief or conviction that Mother "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child," and that she "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child." *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). Further, considering the entire record, we conclude that any disputed evidence could have been reconciled in favor of the jury's findings, such that the jury could have reasonably formed a firm belief or conviction that Mother "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child," and that she "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child." *See id*. Accordingly, the evidence in this record is legally and factually sufficient to support a statutory ground for termination of Mother's parental rights under subsections 161.001(b)(1)(D) and (E) of the Family Code. We overrule Mother's first issue.

**Sufficient evidence supports jury's best-interest finding**

In her second issue, Mother challenges the factual and legal sufficiency of the jury's finding that termination of her parental rights was in the child's best interest. *See id*. § 161.001(b)(2). In determining whether termination of parental rights was in the child's best interest, we may consider a non-exhaustive list of factors including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and

physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see* Tex. Fam. Code § 263.307 (noting that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and setting forth factors to consider in evaluating parent's willingness and ability to provide child with safe environment).[7] Proof of all these factors is not a prerequisite to termination of parental rights, and the absence of some factors does not preclude the jury from finding by clear and convincing evidence that termination is in the child's best interest, especially when there is undisputed evidence that the parental relationship endangered the child. *In re C.H.*, 89 S.W.3d 17,

---

[7] Several of the *Holley* factors overlap with the statutory factors set forth in section 263.307 of the Family Code, which include: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of the harm to the child; whether the child has been the victim of repeated harm after the initial report and intervention by the department; whether the child is fearful of living in or returning to the child's home; the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; whether the perpetrator of the harm to the child is identified; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills; and whether an adequate social support system consisting of an extended family and friends is available to the child. Tex. Fam. Code § 263.307.

27 (Tex. 2002). Evidence that proves one or more of the statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *Id*. at 28.

As to the desires of the child, the jury heard that L.S. was just 2½ years old at the time of trial, and thus, too young to express his desires. In such cases, the factfinder may consider the quality and extent of the child's relationship with the prospective placements. *See J.F.*, 2016 Tex. App. LEXIS 13564, at *29–30; *In re J.D.*, 436 S.W.3d at 118; *In re U.P.*, 105 S.W.3d 222, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (considering evidence that child was well cared for by foster parents, had bonded with them, and spent minimal time with parent when assessing toddler's desires). Here, L.S. has been living with the Turners for the majority of his life. He spent seventeen months in their home before the monitored return in March 2017, and several more months with them before trial. There was evidence that L.S. was bonded to the Turners, who plan to adopt him, that he loved interacting with them, looked to them for comfort, and seemed comfortable in their home. Karim-Paris testified that CASA had no safety concerns about L.S. living there and that the Turners are very protective caregivers.

As to the emotional and physical needs of the child, and the emotional and physical danger to the child, the Department reported that one area of concern is L.S.'s loss of a twin sibling. Psychologist Alissa Sherry testified that children can suffer post traumatic stress disorder (PTSD) from being exposed to the death of someone close to them, and that one of the most important things a parent can do to prevent the child's PTSD is to have an emotionally secure attachment with the child and be responsive to the child's needs. The evidence showed that L.S. is bonded to the Turners, that he "easily adjusted to the familiar environment" of their home, and that he is a happy

and active toddler.  In considering L.S.'s emotional and physical needs, the jury could have also considered that Mother's inability to be protective of L.C.S. and to even think that Father caused L.C.S.'s injuries allows for the possibility of future similar harm if L.S. were left in her care.  *See In re J.D.*, 436 S.W.3d at 118; *In re B.R.*, 2013 Tex. App. LEXIS 7694, at *22 (noting that factfinder may infer from parent's past inability to meet child's physical and emotional needs similar inability or unwillingness to meet child's needs in future); *Castorena v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-02-00653-CV, 2004 Tex. App. LEXIS 3753, at *32–33 (Tex. App.—Austin Apr. 29, 2004, no pet.) (mem. op.) ("[A] fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent."). Caseworker Ayres testified that it was in L.S.'s best interest for Mother's parental rights to be terminated because, "I worry that the same thing that happened to [L.C.S.] could happen to [L.S.]. I just have concerns that [Mother] is not able to see when a child in her care is being harmed.  And I don't know if she would be able to prevent future injuries."

As to the parental abilities of the individuals seeking custody and the stability of the home or proposed placement, the evidence showed that the Turners have been married for eighteen years, that L.S. is bonded to them, that they are able to provide a safe and permanent home for him, and that they have been his home for most of his life.  *See In re J.D.*, 436 S.W.3d at 118 (noting that stability and permanence are paramount in upbringing of children).  Gayla Turner testified that she and her husband had L.S. with them for eighteen months until the monitored-return date and that they spent another five months with L.S. when he was returned to the Turners' home.  She stated that L.S. was not a chronically sick child, but rather, an energetic and affectionate "regular two-year old

27

boy." She testified that she and her husband are willing to adopt L.S. if Mother's and Father's parental rights are terminated. She also testified that since L.S. was returned to the Turners, they have also been caring for L.S.'s sister K.S.

As to the plans for the child by the individuals seeking custody, Jonathan Turner testified that he and his wife would like to adopt L.S. He stated that he wants to give L.S. every opportunity for the "joys of growing up," to live a full and happy life, to make sure that all of his needs are met, and to help instruct him on how to make the right decisions and choices. He stated that L.S. was doing fine, was developmentally on target, attends a day care twice a week, and did not show any behaviors different than when he had left their care. Both CASA and the Department support the Turners' plan to adopt L.S., and there was testimony that the termination of parental rights and adoption is in L.S.'s best interest.

As to the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper, there was evidence that Mother maintains and encourages her children's relationships with Father and her brother, despite what Mother knows and has been informed about their past harm to her children. Caseworker Ayres testified that it would not be in L.S.'s best interest emotionally to be forced into a relationship with Father. Based on Mother's testimony and actions with her other children, Ayres was concerned that if L.S. were returned to Mother's care, she might take him to see Father in jail or make L.S. talk to him by phone as she had done with her two older children. Ayres testified that when Mother has been asked to listen to medical testimony about the cause of L.S.'s injuries, Mother "offers a different excuse every time. For instance, when we were at the contested hearing, [Mother] said that she could make a decision

28

about what happened to [L.S.] once they got the autopsy. And now we've received the autopsy, and we're here at trial and she wants more medical evidence." Ayres said that Mother seemed to be "searching for something different. And I don't know if she would be able to see that one of her other children were also being injured."

Viewing the evidence in the light most favorable to the jury's findings, and assuming that the jury resolved any disputed facts in favor of its findings, we conclude that the jury could have formed a firm belief or conviction that termination of Mother's parental rights was in L.S.'s best interest. *See* Tex. Fam. Code § 161.001(b)(2). Further, considering the entire record, we conclude that any disputed evidence could have been reconciled in favor of the jury's findings, such that the jury could have formed a firm belief or conviction that termination of Mother's parental rights was in L.S.'s best interest. *See id*. Thus, the evidence in this record is legally and factually sufficient to support the jury's best-interest finding under section 161.001(b)(2) of the Family Code. We overrule Mother's second issue.

**No abuse of discretion in denial of requested jury instruction**

In her third and final issue, Mother challenges the district court's denial of her requested instruction, "something to the effect of, '[I]f less than ten jurors agree on a particular answer, then no juror should sign the verdict.'" We review a trial court's decision to refuse a particular instruction under an abuse-of-discretion standard. *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012); *Texas Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990) (concluding in suit for termination of parental rights that "[t]he standard for review of the charge is abuse of discretion, and abuse of discretion occurs only when the trial court acts without reference to any

29

guiding principle"). A trial court has considerably more discretion in submitting instructions than it has in submitting questions. *Thota*, 366 S.W.3d at 687; *Young v. Texas Dep't of Protective & Regulatory Servs.*, No. 03-01-00376-CV, 2002 Tex. App. LEXIS 1132, at *3 (Tex. App.—Austin Feb. 14, 2002, no pet.) (mem. op.). An instruction is proper if it: (1) assists the jury; (2) accurately states the law; and (3) finds support in the pleadings and evidence. *Thota*, 366 S.W.3d at 687; *see* Tex. R. Civ. P. 277 ("The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict.").

During the charge conference below, Mother did not object to any aspect of the court's proposed charge. She merely requested two additions, one to add emphasis to a definition and the other to add an instruction that was similar to one already in the court's charge. Specifically, Mother requested: (1) that the definition of clear-and-convincing evidence appear in bold, underlined, or italicized print; and (2) an additional instruction stating that the verdict should not be signed if less than ten jurors agreed on a particular answer. In her discussion of the charge, Mother did not state why her proposed instruction should be included:

| | |
|---|---|
| THE COURT: | Respondent mother, are there requests or objections to the Court's Charge? |
| [Mother's counsel]: | Request, Your Honor. |
| THE COURT: | Please state your request. |
| [Mother's counsel]: | The request is that a sentence be added to page seven of the jury charge, immediately above the sentence that reads: ["]If ten jurors agree on each answer, then those ten jurors sign the verdict.["] I'm requesting that a sentence be inserted above that that states something to the effect of, ["I]f less than ten |

30

jurors agree on a particular answer, then no juror should sign the verdict.["]

THE COURT: The request is denied. Any other requests or objections from respondent mother?

[Mother's counsel]: I would also request that on page two of the jury charge, that the clear and convincing evidence definition, that the words "produces a firm belief or conviction that the allegations sought to be established are true" be either placed in bold, underlined, or italics.

THE COURT: The request is denied. Any other requests or objections from respondent mother?

[Mother's counsel]: No, Your Honor. Thank you.

As the Department correctly notes, the Instructions on the second page of the court's charge included Instruction No. 11 stating, "The answers to the questions must be based on the decision of at least ten of the twelve jurors." This tracks the instruction for a twelve-member jury set forth in the Texas Pattern Jury Charge. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Family & Probate* PJC 200.3A (2016). Mother makes no mention of Instruction No. 11 and fails to show how her requested instruction—"something to the effect of, if less than ten jurors agree on a particular answer, then no juror should sign the verdict"—would have provided greater assistance to the jury in rendering their verdict. *See* Tex. R. Civ. P. 277; *Thota*, 366 S.W.3d at 687. We conclude that Mother has not shown that the district court abused its discretion by denying her requested instruction, and we overrule her third issue.[8]

_____

[8] Mother contends—for the first time on appeal—that the charge was "unduly suggestive," "confusing," and "misleading" because in her view, the jury instructions "improperly mandated" that ten, eleven, or twelve jurors answer each question and presupposed that they would do so when they

31

## II. Father's appeal

Father's appointed counsel filed a brief discussing the standard of review and the sufficiency of the evidence at trial, concluding that Father has no arguable grounds for appeal and that Father's appeal is wholly frivolous. *See Anders*, 386 U.S. at 744; *High v. State*, 573 S.W.2d 807, 811 (Tex. Crim. App. 1978); *see also Taylor*, 160 S.W.3d at 646–47. Father's counsel has certified to this Court that he provided Father with a copy of the brief, along with a notice advising Father of his right to examine the appellate record and to file a pro se brief. No pro se brief has been filed.

Having thoroughly reviewed the record and counsel's brief, we agree with counsel's assessment that the appeal is frivolous and without merit. Father's counsel's request to withdraw is denied. *See In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016).[9]

---

signed the verdict. However, a party objecting to a charge must point out distinctly the objectionable matter and the grounds for the objection. Tex. R. Civ. P. 274. Any complaint about a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in an objection. *Id*. As noted above, Mother made no objection to any aspect of the court's proposed charge and informed the court that she had no "other requests or objections" besides her two requested additions to the charge. Plainly, Mother never made the court aware of her complaints that an instruction was unduly suggestive, confusing, and misleading. Thus, Mother has waived those complaints on appeal. *See id*.; *see also* Tex. R. App. P. 33.1(a) (requiring timely and specific complaint to trial court to preserve complaint for appellate review). Further, we note that the complained-of instructions tracked the "Instructions for Signing the Verdict Certificate" for a twelve-member jury set forth in the Texas Pattern Jury Charge. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Family & Probate* PJC 200.3A (2016).

[9] The Texas Supreme Court has held that the right to counsel in suits seeking termination of parental rights extends to "all proceedings in [the Texas Supreme Court], including the filing of a petition for review." *In re P.M.*, 520 S.W.3d 24, 27 (Tex. 2016). Thus, counsel's obligation to Father has not yet been discharged, and the request to withdraw is premature. *See id*. If Father, after consulting with counsel, desires to file a petition for review, counsel should timely file with the Texas Supreme Court "a petition for review that satisfies the standards for an *Anders* brief." *Id*. at 27–28.

## CONCLUSION

We affirm the district court's judgment terminating the parental rights of V.C. and R.S.

_____
Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Goodwin and Field

Affirmed

Filed:   June 22, 2018